**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN M. FIFE,<br><br>       Plaintiff,<br><br>  v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,<br><br>       Defendant. | **No.**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

GUSRAE KAPLAN NUSBAUM PLLC
Martin H. Kaplan
Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
Tel: (212) 269-1400
Fax: (212) 809-4147
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Attorneys for Plaintiff*

Through undersigned counsel, Plaintiff John M. Fife sets forth this Complaint against Defendant Financial Industry Regulatory Authority, Inc. ("**FINRA**"):

1. Defendant FINRA is non-profit self-regulatory organization ("**SRO**") that licenses and regulates securities broker–dealers and their associated persons, such as stockbrokers and investment bankers.

2. FINRA, which also provides an arbitral forum for members' disputes, was formed by the merger of the New York Stock Exchange's regulatory functions and the National Association of Securities Dealers, Inc. ("**NASD**").

3. FINRA is not, itself, a governmental body, but has been delegated the authority to regulate its members by the United States Securities and Exchange Commission (the "**SEC**") pursuant to the Securities Exchange Act of 1934 (the "**Exchange Act**").

4. The Exchange Act establishes FINRA's authority to "appropriately discipline[]" "its members and persons associated with its members." 15 U.S.C. § 78o-3(b)(7).

5. The Exchange Act also provides that the SEC may divest FINRA of its powers. 15 U.S.C. § 78s(a)(3).

6. In approving the formation of FINRA, the SEC noted that FINRA "would be responsible for regulatory oversight of all securities firms that do business with the public; professional training, testing, and licensing of registered persons; arbitration and mediation; market regulation by contract for The NASDAQ Stock Market, Inc., the American Stock Exchange LLC, and the International Securities Exchange, LLC; and

industry utilities, such as Trade Reporting Facilities and other over-the-counter operations."[1]

7. Plaintiff John M. Fife has never been registered with FINRA and has never acted as an associated person of any FINRA member entity.

8. Since the 1990s, Mr. Fife and his family office have invested millions in small-cap and start-up businesses.

9. Because some of those investments have involved securities, Mr. Fife and his family office have been customers of a number of FINRA-registered broker–dealers over the decades.

10. In 2011, FINRA demanded that Mr. Fife testify in FINRA's investigation of a FINRA-registered broker–dealer and its principal (the "**Gordon Investigation**").

11. While Mr. Fife was merely a customer of that broker–dealer, FINRA demanded his testimony pursuant to FINRA Rule 8210, which provides that FINRA may require testimony from "a member, person associated with a member, or any other person subject to FINRA's jurisdiction."

12. FINRA did not provide Mr. Fife with a court-issued subpoena or any other reason why he should honor their Rule 8210 demand.

13. Because Mr. Fife was not "a member, person associated with a member, or any other person subject to FINRA's jurisdiction," he rejected FINRA's demand that he fly halfway across the country to testify.

---

[1] Self-Regulatory Organizations, Exchange Act Release No. 34-56154 (July 26, 2007), https://www.sec.gov/rules/sro/nasd/2007/34-56145.pdf.

14. After Mr. Fife refused to testify, FINRA suspended him from its membership or association (the "**FINRA Suspension**").

15. When Mr. Fife did not challenge the FINRA Suspension, FINRA barred him (the "**FINRA Bar**").

16. At the time, Mr. Fife did not challenge FINRA's 8210 request, Suspension, or Bar.

17. He had no involvement in the securities industry to "suspend," and he had never been a member of, or licensed in the profession from which he was "disbarred."

18. Since Mr. Fife had never worked in and had no intention of working in the securities industry, it simply was not worth the time, energy, and expense to challenge a private non-profit regulator that had no actual authority over him.

19. Long after Mr. Fife declined to participate in the 2011 FINRA Investigation, the SEC implemented new ramifications against people suspended or barred by FINRA.

20. The September 2013 "bad actor" rule requires Mr. Fife's FINRA disciplinary history to be disclosed if he participates in securities offerings made pursuant to Regulation D; if the same conduct had occurred after September 23, 2013, it would have barred his participation entirely.

21. Even then, because Mr. Fife has always been merely a brokerage customer—not a securities issuer or underwriter—he did not challenge the FINRA Suspension or Bar.

22. Neither the Suspension nor the Bar prohibited Mr. Fife from investing in securities and holding them in his accounts held at FINRA-registered broker–dealers.

23. But in September 2020, the SEC filed a civil action against Mr. Fife for new conduct unrelated to the 2011 FINRA Investigation, accusing him of violating Exchange Act Section 15(a)(1)—for providing fully-disclosed loans of which the SEC had been aware for well over a decade.

24. Invoking the FINRA Bar, the SEC's Complaint characterizes Mr. Fife as a "recidivist violator of the federal securities laws."

25. The SEC is leveraging the FINRA Bar to argue both the merits of their case and for a more draconian outcome.

26. In other words, nearly nine years after FINRA exceeded its statutory authority to bar a man over whom it lacked jurisdiction, and seven years after that bar began carrying limited practical consequences that were immaterial to Mr. Fife and his family's investments, the federal government now is using the FINRA Bar against him in a confiscatory enforcement action.

27. Consequently, Mr. Fife sues for declaratory judgment that the FINRA Bar is null and void because FINRA's actions against him exceeded its statutory authority.

**Jurisdiction and Venue**

28. At all relevant times, Mr. Fife was a resident of Chicago, Illinois.

29. Defendant FINRA is headquartered in the District of Columbia and has nineteen offices and 3600 employees throughout the United States.

30. Considering its line of work, it is no surprise that FINRA's busiest jurisdiction is New York State.

31. Today, FINRA has two offices within five blocks of each other in Lower Manhattan and a third New York office in Nassau County on Long Island.

32. FINRA has another New York City area office in Woodbridge Township, New Jersey, directly across the water from Staten Island.

33. Here, the Gordon Investigation, FINRA Suspension, and FINRA Bar were conducted by FINRA personnel in Manhattan who worked out of FINRA's Manhattan offices.

34. FINRA's missives to Mr. Fife instructed him to respond to those personnel at their Broad Street and Wall Street addresses and phone numbers.

35. Despite knowing that Mr. Fife lived and worked in Chicago, and despite the fact that FINRA has a Chicago office, FINRA also demanded that Mr. Fife (and his wife) travel to Manhattan to give testimony at FINRA's One World Trade Center office at 200 Liberty Street, Manhattan.

36. Because Mr. Fife's suit arises under the Exchange Act, this Court has subject-matter jurisdiction.

37. Venue is proper in this district pursuant to 15 U.S.C. § 78aa.

**Mr. Fife Has Never Worked in the Securities Industry**

38. Mr. Fife is an entrepreneur, investor, and philanthropist who received a Bachelor of Science degree in Computer Science and Statistics from Brigham Young University in 1986 and a Master's of Business Administration degree from Harvard Business School in 1990.

39. Mr. Fife has never worked as a stockbroker, investment banker, or other FINRA-licensed securities professional.

40. Mr. Fife has never associated with a broker–dealer or registered with FINRA or its predecessor entities.

41. After beginning his career as a database consultant at Oracle, Mr. Fife has founded and managed several multi-million dollar businesses.

42. Today, he is the President, Chief Executive Officer ("**CEO**"), and Chairman of the Board ("**Chairman**") of Utah Resources International, Inc., a real estate development and management company; President, CEO, and Chairman of United American Healthcare Corporation, a holding company whose subsidiaries have included natural rubber production, medical device manufacturing, and cryptocurrency businesses; Chairman of Miller Fabrication LLC ("**Miller Fabrication**"), a Wyoming-based oilfield and construction services provider to the energy industry; and President of Typenex Medical ("**Typenex**"), a Chicago-based medical device company.

43. Most relevant to this lawsuit, Mr. Fife is the owner and sole Managing Partner of Chicago Venture Partners, L.P. ("**CVP**"), whose primary activities are providing capital to publicly-traded entities through private transactions ("**PIPE**") and

6

pursuing strategic acquisitions for CVP's wholly-owned businesses and other affiliated companies, including Miller Fabrication and Typenex.

44. CVP is Mr. Fife's family office and manages approximately $150 million of the Fife family's own wealth.

45. All of CVP's investments are made with Mr. Fife's own money and only his money.

46. CVP does not manage or invest money for any other investors or customers.

47. CVP loans Mr. Fife's money to small businesses, including as "**PIPE**" loans: private investments into public equity.

48. These loans are sometimes structured as convertible notes, which give the borrower the flexibility to repay the debt either by repaying the loan in cash or providing shares of the borrower's common stock.

49. PIPEs can be particularly attractive to smaller and newer public companies that have difficulty accessing more traditional forms of equity financing.

50. Raising money through PIPEs also tends to be faster and more efficient than attempting to raise new funds through a secondary public offering.

51. Small and start-up businesses often raise financing via private transactions.

52. The securities that they issue typically must be "restricted" as contemplated by SEC Rule 144, which prohibits the investor from reselling the securities for the time period mandated by statute or regulation.

53. Those holding periods make restricted securities riskier investments for lenders: the longer one must hold the security, the more that can go wrong—especially with the small-cap and start-up companies that borrow from Mr. Fife.

54. In 1997 and 2007, the SEC implemented several regulatory reforms to encourage investors like Mr. Fife to make PIPE investments.

55. After the 1997 amendments, lenders like Mr. Fife could engage in a "limited resale" of restricted securities after one year instead of two years, and "unlimited resales" after two years instead of three.

56. In 2007, the SEC not only shortened both holding periods to just six months, but also adopted rules specifically intended to facilitate convertible transactions like those described above, "particularly for smaller companies."

57. For over 15 years, Mr. Fife has invested in micro-cap companies via PIPE transactions.

58. In exchange for Mr. Fife's cash infusions, some companies provided him with convertible notes (the "**Notes**") that the borrowing companies sometimes choose to repay with shares of their common stock rather than repaying in cash.

59. The Notes and their underlying agreements had affiliate "blockers" so that the Notes' conversion into common stock would never amount to more than 9.9% of the issuer's outstanding shares.

60. Like other securities, those newly-issued securities necessarily had to be sold through accounts at FINRA-registered broker–dealers.

61. Once Rule 144's provisions were satisfied, Mr. Fife would request the broker-dealer to sell the securities out of his accounts into the public markets.

62. The sophisticated nature of Mr. Fife's investments required white-glove service from his broker–dealers.

63. Similar to how many operations require customized services from their key vendors, whether Amazon Web Services or Salesforce, Mr. Fife's business required a broker–dealer that would tailor its services to Mr. Fife' specialized needs.

64. Because Mr. Fife's business required high levels of care and capital, his account was also very lucrative for the broker–dealers that landed his accounts, which typically were paid via commissions on the liquidating transactions.

**Mr. Fife was a Mere Customer and Non-Voting Minority Stockholder of Gordon**

65. In 2011, Mr. Fife entered into a new customer relationship with a Boston-based clearing broker–dealer Gordon & Co. ("**Gordon**" or the "**Brokerage**").

66. Gordon was managed by CEO Allison Salke and owned by her family.

67. Gordon had been an active business for over 50 years and Ms. Salke had been registered as a principal with FINRA and associated with the Brokerage for over 20 years.

68. When Mr. Fife opened his customer accounts with Gordon, Ms. Salke held FINRA Series 7, 24, 27, 55, and 63 licenses.[2]

---

[2] The Series 7 is the General Securities Representative license; the Series 24 is the General Securities Principal license; the Series 27 is the Financial and Operations Principal license; the Series 55 is the Limited Representative–Equity Trader license; and the Series 63 is the Uniform Securities Agent State Law license.

9

69. Because Gordon was a self-clearing firm, it was able to maintain custody of its customers' securities and, under then-existing regulation, was responsible for segregating customer funds and securities.

70. A Massachusetts partnership that had been formed in 1961, Gordon historically had been a family business, and was registered with FINRA and its predecessor from 1983 to 2012.

71. Throughout Mr. Fife's relationship with Gordon, Ms. Salke's family owned over 95% of the Brokerage.

72. Around the same time that Mr. Fife opened multiple customer accounts with Gordon, a Fife family trust (the "**Trust**") invested $150,000 in Gordon in exchange for 12.5% of the Brokerage's non-voting Class B shares.

73. The Trust's trustee was Mr. Fife's wife and its beneficiaries were his children.

74. Ms. Salke continued to control and make all decisions regarding the operations and activities of Gordon, her family's business.

75. Neither the Trust nor Mr. Fife managed or controlled Gordon.

76. Indeed, when the Trust invested in Gordon, it explicitly agreed that it was prohibited from participating in the Brokerage's daily business activities.

77. Furthermore, the Class B units had the fewest economic rights of the three types of equity in the Brokerage.

78. The Trust's involvement in Gordon's operations was limited to input on discrete compensation and governance matters: typical and baseline investor-protection provisions.

79. Because Mr. Fife was one of Gordon's two primary customers, Ms. Salke also sometimes discussed customer service, client referral, and risk issues with Mr. Fife.

**FINRA Demanded that Mr. Fife Testify in Its 2011 Investigation of Gordon**

80. Less than six months after Mr. Fife became a customer of Gordon, FINRA sent him the 8210 demand for testimony.

81. That demand stated, without further explanation, that FINRA was investigating Gordon "to determine whether [unidentified] violations of [unidentified] federal securities laws or [unidentified] FINRA, NASD, NYSE, or MSRB rules ha[d] occurred" pursuant to an investigation FINRA had titled "Gordon & Co., No. 20110292037" (the "**Gordon Investigation**").

82. In early fall 2011, FINRA had sent Gordon and Ms. Salke requests for information pursuant to FINRA Rule 8210, issued pursuant to the same Gordon Investigation.

83. FINRA's information requests to Gordon and Ms. Salke claimed, among other allegations, that the Trust's 12.5% ownership of Class B shares had triggered Gordon's NASD requirement to "file an application for approval of equity ownership or partnership capital of the member that results in one person or entity directly or indirectly owning or controlling 25 percent or more of the equity or partnership capital."

84. FINRA also claimed that Mr. Fife was "involved in the management of" Gordon and that Gordon had been required to register him with FINRA as a principal of the Brokerage.

85. Gordon and Ms. Salke disagreed with FINRA's characterizations and quickly refuted them in a letter dated October 3, 2011.

86. But on October 18, 2011, FINRA sent Gordon Investigation 8210 requests to Mr. Fife and his wife, directing them to travel from Chicago to Manhattan to give testimony in the Gordon Investigation in just one week: on October 25, 2011.

87. In response, Mr. Fife sought and retained counsel, who secured the Fifes a two-week adjournment to November 10, 2011, as memorialized in a second set of Rule 8210 requests.

88. Both the October 25 and November 10 requests claimed that "[u]nder FINRA Rule 8210, Mr. and Mrs. Fife [we]re obligated to appear as requested."

89. The requests also contained FINRA's form caution that because FINRA is not a governmental entity, any witnesses who appear for Rule 8210 interviews, including Mr. and Mrs. Fife, would not be permitted to invoke their Fifth Amendment rights when testifying before FINRA.

90. Nothing in the Requests explained why Mr. or Mrs. Fife should be required to travel across the country and give up their Constitutional rights to satisfy the whims of a professional association to which they did not belong.

91. After investigating the circumstances, the Fifes' counsel advised them that FINRA lacked jurisdiction to compel their testimony or discipline them.

92. While the Fifes were aware that FINRA could purport to suspend and bar them, at the time, the Fifes had no reason to expect that either sanction would have any practical effect on their lives, businesses, or investments: neither of them had ever worked in the securities industry, and neither of them planned to ever work in the securities industry.

93. The Fifes have always been mere customers, not principals or other registered persons, of securities firms.

94. Although Mr. Fife had made a business of PIPE transactions for over a decade, he had always sold the converted shares through his accounts at registered broker-dealers.

95. On January 3, 2012, FINRA issued Notices of Suspension to Mr. and Mrs. Fife, which stated that FINRA would "suspend [them] from associating with any FINRA member in any capacity because [they] failed to provide information to FINRA, which had been requested from [them] in accordance with and pursuant to FINRA Rule 8210."

96. The Notice of Suspension further stated that if the Fifes "fail[ed] to request termination of the suspension within three months [ . . . they would] be automatically be barred on April 6, 2012 from associating with any FINRA member in any capacity" pursuant to FINRA Rule 9552(h).

97. The Fifes did not respond to the Notice of Suspension or otherwise challenge the Suspension.

98. On April 6, 2012, FINRA barred the Fifes "pursuant to FINRA Rule 9552(h) and[] in accordance with FINRA's Notice of Suspension."

### After 2012, the SEC Changed the FINRA Bar's Consequences

99. In the years since the FINRA Suspension and Bar, Mr. Fife has continued to invest in small and emerging companies.

100. While, as discussed above, the SEC has imposed new regulatory consequences for those barred by FINRA, those amendments had not materially impacted Mr. Fife or his business.

101. But in Spring 2020, the SEC revealed a new prosecutorial theory to attempt to crack down on these types of investments, filing several enforcement actions in federal court against at least three other investors.

102. In those complaints, the SEC argued—for the very first time—that those investors' purchases of convertible notes and sales of ensuing securities comprised activity that required the participants to be registered as securities dealers pursuant to Exchange Act Section 15(a)(1).

103. In September 2020, the SEC filed a nearly-identical action against Mr. Fife, CVP, and other Fife family investment vehicles in the federal court for the Northern District of Illinois captioned <u>Securities and Exchange Commission v. John M. Fife et al.</u>, No. 1:20-cv-05227 (the "**Chicago Complaint**").

104. On December 7, 2020, Mr. Fife moved to dismiss the Chicago Complaint.

105. Among other issues, Mr. Fife argues that the SEC's theory "rests on an interpretation of 'dealer' that is contrary to the plain text, structure, and history of the Exchange Act, over a century of legal and business precedent, and the [SEC's] repeated and consistent guidance," and that the SEC "violates the Due Process Clause by seeking

to retroactively enforce a novel, newly-minted interpretation of 'dealer' that jettisons decades of agency and judicial application."

106. The SEC also alleges that Mr. Fife's "recidivist history" warrants injunctive relief that bars him and any affiliated entities from "participating in the offering of any penny stock" and violating Section 15(a)(1) of the Exchange Act.

107. Such injunctions would damage Mr. Fife and his family by disqualifying Mr. Fife from participating in private placements and other securities transactions that are the core of his family's investments.

108. The SEC also is requesting "appropriate civil penalties [ . . . ] pursuant to Section 21(d)(3) of the Exchange Act," which directs courts to consider, among other factors, whether the defendant "deliberate[ly] or reckless[ly] disregard[ed] a regulatory requirement."

109. In other words, nearly a decade after the FINRA Investigation into Gordon and Bar of Mr. Fife, new facts, new prosecutorial theories, and new statutory and regulatory consequences mean that FINRA's improper exercise of jurisdiction has caused and continues to cause Mr. Fife new and continuing harms.

110. Consequently, Mr. Fife respectfully requests that this Court issue judgment nullifying the FINRA Suspension and Bar.

## **CLAIM**

## **COUNT I – DECLARATORY JUDGMENT**

111. Mr. Fife repeats the foregoing allegations as if set forth herein.

112. FINRA is a not-for-profit self-regulatory organization whose jurisdiction is established by the Exchange Act and interpreted by the SEC.

113. FINRA is authorized to exercise jurisdiction over only its member broker–dealers and their associated persons, such as stockbrokers, compliance professionals, and investment bankers.

114. FINRA has no legal authority to exercise disciplinary jurisdiction over other people.

115. As with FINRA arbitration, FINRA's disciplinary jurisdiction is essentially a creature of contract: unless a person is a securities professional and thereby invokes FINRA's privileges, he is not subject to its jurisdiction.

116. For example, FINRA-registered broker–dealers submit Forms U4 to apply for individual registered representatives' registration or transfer with FINRA.

117. By signing the Form U4, the applicant authorizes FINRA's disciplinary and arbitral jurisdiction over him in exchange for the applicant's ability to practice as a securities professional.

118. Forcing Mr. Fife to appear before FINRA simply to argue that he need not appear before FINRA provides Mr. Fife no genuine opportunity for adequate relief: FINRA's unlawful exercise of jurisdiction is exactly the harm that Mr. Fife sought and continues to seek to avoid.

119. Furthermore, the FINRA Suspension and Bar now carry practical consequences that did not exist in 2011 and 2012, when FINRA demanded Mr. Fife's appearance and sanctioned his refusal to testify.

### **RELIEF REQUESTED**

WHEREFORE, Mr. Fife requests the following relief:

(i) Declaratory judgment that the FINRA Suspension and Bar are null and void;

(ii) Attorneys' fees, costs, expenses, and interest;

(iii) Incidental and consequential relief; and

(iv) All other relief that the Court deems just and proper.

GUSRAE KAPLAN NUSBAUM PLLC

/s/Martin H. Kaplan
Martin H. Kaplan
Kari Parks
120 Wall Street
New York, New York 10005
(212) 269-1400
mkaplan@gusraekaplan.com
kparks@gusraekaplan.com

*Attorneys for Plaintiff*

Dated: December 18, 2020
New York, New York